**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-01916

JORDAN CHRISTENSEN,

      Plaintiff,

v.

DENVER HEALTH AND HOSPITAL AUTHORITY D/B/A DENVER HEALTH
PARAMEDIC DIVISION

      Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff, Jordan Christensen, by and through his attorneys of KONTNIK | COHEN, LLC, hereby brings this *Complaint and Jury Demand* against Defendant, Denver Health & Hospital Authority d/b/a Denver Health Paramedic Division ("Denver Health"), under Title VII of the Civil Rights Act ("Title VII"), and the Colorado Anti-Discrimination Act ("CADA"), and states as follows:

## I.      INTRODUCTION

1.     This is a sexual-orientation discrimination, hostile work environment, and retaliation lawsuit brought by Jordan Christensen against Defendant. As detailed herein, Mr. Christensen was repeatedly subject to ongoing harassment and discrimination after he announced on Facebook that he was gay in 2015. Mr. Christensen was consistently subjected to negative and derogatory comments from his superiors and harassed by his

1

superiors, who were never reprimanded or counseled with respect to their discriminatory behavior.

2.      Defendant's culture of harassment and retaliation was so prevalent in Defendant's workplace that on March 6, 2019, Defendant sent out a letter to the entire paramedic division addressing repeated complaints of intimidation and retaliation by its employees. The letter instructed employees who wanted to participate in the investigation to contact Defendant's legal department and explained that any complaints would be confidential. However, when Mr. Christensen complained of discrimination on March 28, 2019, Defendant disclosed the fact that he had complained to the individuals who had been harassing him based on his sexual orientation and generally ignored Mr. Christensen's complaints. Defendant required Mr. Christensen to keep working under the same individuals who had been harassing him daily for years.

3.      Defendant's discrimination and retaliation toward Mr. Christensen culminated in his termination on January 8, 2021, which was based on his sexual orientation and a result of his complaints about unequal treatment as a member of the LGBTQ community.

## II.      <u>JURISDICTION AND VENUE</u>

4.      This action is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*, and the Colorado Anti-Discrimination Act. C.R.S. §§ 24-34-401 *et seq.*

5.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1331 for the federal law claims, and 28 U.S.C. § 1367 for the state law claim.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to these claims occurred in the District of Colorado and the Defendant is located in Denver, Colorado.

### III.      ADMINISTRATIVE PREREQUISITES

7.      Plaintiff timely filed his joint charge of discrimination (Charge No. 32A-2021-00499, CCRD Charge No. E2100011553) with the Equal Employment Opportunity Commission ("EEOC") and Colorado Civil Rights Division ("CCRD") on April 1, 2021.

8.      On May 4, 2022, Mr. Christensen was issued a Letter of Determination for CCRD Complaint Number: E2100011553 which contained a Notice of Right to Sue.

9.      This action is being commenced within ninety (90) days of receiving the Notice of Right to Sue, CCRD Complaint Number: E2100010907.

### IV.      PARTIES

10.     Mr. Christensen was, at all times relevant to this lawsuit, a resident of the State of Colorado and was employed by Defendant Denver Health & Hospital Authority in Denver, Colorado.

11.     Mr. Christensen is gay and thus, a member of the classes of persons protected by Title VII and CADA.

12.     Defendant is a Colorado quasi-governmental entity and is a "safety net" hospital that provides health care services to Colorado patients.

13.     Defendant is registered to do business in the state of Colorado with its principal office at 777 Bannock Street, Denver Health & Hospital Authority, Denver, Colorado 80204, United States.

14.     Defendant has continuously been an employer within the meaning of Title VII and CADA at all times relevant to this Complaint.

15.     Defendant employed more than fifteen (15) individuals at all times relevant to this lawsuit.

## V.      FACTUAL ALLEGATIONS

### JORDAN CHRISTENSEN

16.     Mr. Christensen volunteered as an Emergency Medical Technician ("EMT") from 2005 to 2008 with the Bennet Fire Department.

17.     Mr. Christensen worked as an EMT from 2007 to 2012 at Rural Metro Ambulance.

18.     Mr. Christensen was hired by Defendant as a Paramedic on August 14, 2012.

19.     Mr. Christensen scored a "meets expectations" or higher on every performance review during his employment with Defendant.

20.     Mr. Christensen received two Denver Health Star awards, four Denver Health Paramedic Division Commendations, the Medical Directors award, and the Preceptor of the Year award.

21.     On January 8, 2021, Defendant Denver Health terminated Mr. Christensen after he had complained repeatedly about discrimination on the basis of his sexual orientation.

### DEFENDANT DENVER HEALTH AND HOSPITAL AUTHORITY

22.     Defendant Denver Health is a public hospital located in Denver, Colorado.

23.     Defendant Denver Health has a history of lawsuits related to discrimination toward minorities and members of the LGBTQ community.

24.     Defendant Denver Health maintains an anti-harassment policy which states in relevant part, "[Denver Health] strives to maintain a work environment that is free from discrimination and prohibits unlawful harassment including sexual harassment and harassment based on race, color, national origin, age, gender, sexual orientation …"

25.     Defendant's policy further states that, "[i]ncidents of harassment and inappropriate conduct will not be tolerated at [Denver Health]."

26.     Defendant's anti-discrimination policy applies to "conduct in the workplace … as well as off-premises situations with a relationship to the workplace or that impact the workplace."

27.     The policy describes examples of other harassment: "[h]arassing conduct includes epithets, slurs or negative stereotyping; threatening, intimidating or hostile acts; jokes and written or graphic material that degrades or shows hostility or aversion toward an individual or group based on protected status."

28.     All supervisors are required to report instances of harassment and "[o]nce a report of harassment, discrimination and/or retaliation is received, [Denver Health] will conduct a prompt, thorough and unbiased investigation."

29.     Discipline for discrimination "includes [] action up to an including termination of employment, even for a first offense."

30.     Defendant Denver Health also maintains an Accountability Based Performance (ABP) policy that governs discipline for its employees.

31.     With respect to its performance policy, Defendant's policy states, "[i]n general, circumstances warranting ABP may include violations of and failure to follow organizational requirements, misconduct and inadequate performance."

32.     There are different degrees of ABP performance actions including: (1) Expectation Setting, (2) Reminder One; (3) Reminder Two; (4) Decision Making Leave ("DML"), and (5) Termination of Employment.

33.     Defendant also utilized Performance Improvement Plan(s) ("PIP") and Administrative Suspensions.

34.     With respect to its use of medicine, Defendant Denver Health is a teaching hospital, and it generally does not terminate employees for misuse of medicine.

35.     Defendant's policy against disciplining employees, and specifically paramedics, for improper use of medicine is implemented so stringently that even medical mistakes that have resulted in poor patient outcomes, have gone wholly unpunished.

36.     In some cases, when paramedics have made especially egregious medical mistakes, Defendant has sent them back to field training "to avoid termination."

DEFENDANT'S DISCRIMINATION

37.     Prior to June 26, 2015, Mr. Christensen was subject to differential treatment by Defendant's management team within the paramedic division.

38.     Prior to June 26, 2015, Mr. Christensen became friends with many of his co-workers on Facebook including Lieutenant Dennis Baker, Captain Steven Hulac, and Lieutenant Christopher Pattinson.

39.     On June 26, 2015, Mr. Christensen posted on Facebook to friends and the public stating that he is gay.

40.     Shortly after June 26, 2015, Mr. Christensen noticed a change in the demeanor of many of Defendant's management employees including specifically Lieutenant Dennis Baker, Captain Josh Kennedy, Captain Steven Hulac and Lieutenant Christopher Pattinson.

41.     From June 26, 2015 through the date of his termination, the foregoing individuals repeatedly harassed and treated Mr. Christensen less favorably than his counterparts who did not identify as gay.

LIEUTENANT BAKER AND LIEUTENANT PATTINSON'S DISCRIMINATION

42.     Lieutenant Baker was a rank above Mr. Christensen and was one of Mr. Christensen's supervisors

43.     Lieutenant Pattinson was also a rank above Mr. Christensen and was also one of Mr. Christensen's supervisors.

44.     After June 26, 2015, Lieutenant Baker and Pattinson would regularly make comments directed at Mr. Christensen based on his sexuality and hold Mr. Christensen to different standards.

45.     Lieutenant Pattinson would repeatedly comment on Mr. Christensen's attire and mock him for his choice of clothing.

46.  For example, Lieutenant Pattinson would comment on Mr. Christensen's clothing and ask Mr. Christensen in a demeaning manner, "do they make those pants in a man's size."

47.  Lieutenant Baker would make comments mocking Mr. Christensen's lifestyle choices and home life.

48.  For example, he made statements such as "oh yeah I bet you have so much responsibility to take care of at home," "I bet you have a mortgage and car payment," and "kids… oh that's right - you wouldn't have kids."

49.  Mr. Christensen and his paramedic partner at the time, Leah Collier, would often clock in together and Lieutenant Baker would find a reason to discipline Mr. Christensen while ignoring the exact same behavior from Mr. Christensen's co-workers including Ms. Collier.

50.  For example, Mr. Christensen and Ms. Collier walked in together one day wearing t-shirts under their sweaters with the intention of changing into their uniforms before the start of their shift.

51.  Lieutenant Baker called Mr. Christensen into his office and scolded him stating, "you know that's not part of the uniform."

52.  Lieutenant Baker did not discipline Ms. Collier for the same alleged "infraction."

53.  Mr. Christensen responded explaining that he hadn't changed yet and he has his uniform.

54.     Mr. Christensen also explained that his paramedic partner, Ms. Collier, was wearing the exact same outfit (a t-shirt under her sweater) and Lieutenant Baker responded stating, "that's just the way it is."

55.     Mr. Christensen complained about the foregoing interaction to Defendant's Human Resources ("HR") team, who, upon information and belief, refused to investigate or pursue any remedial or disciplinary actions.

56.     As a result of Defendant's inaction, Lieutenant Baker was allowed to repeatedly treat Mr. Christensen less favorably than his counterparts who are not gay.

57.     As a result of Defendant's inaction, Lieutenant Baker was allowed to repeatedly intimidate Mr. Christensen because of his sexuality.

58.     Lieutenant Baker treated Mr. Christensen less favorably and intimidated Mr. Christensen because of his sexuality.

59.     Lieutenant Baker treated Mr. Christensen less favorably and intimidated Mr. Christensen on a near weekly basis until Mr. Christensen's termination.

CAPTAIN KENNEDY'S DISCRIMINATION

60.     Captain Kennedy was two (2) ranks above Mr. Christensen and was one of Lieutenant Baker's and Lieutenant Pattinson's supervisors.

61.     Captain Kennedy repeatedly disciplined Mr. Christensen for reasons that other paramedics were not disciplined.

62.     For example, Captain Kennedy would routinely write up Mr. Christensen for late clock-ins, uniform violations, and other minor issues for which other paramedics received no discipline.

63.    Ms. Stephens, Mr. Christensen's paramedic partner for approximately eight (8) years, noted that Mr. Christensen was called into the office by Captain Kennedy at least once every month.

64.    Mr. Christensen was also called into the office by Lieutenant Baker, Christopher Pattinson, and Captain Hulac.

65.    The bullying was so bad that Mr. Christensen would wait in his car to avoid Captain Kennedy, Lieutenant Baker, Lieutenant Pattinson, and Captain Hulac at the start of his shift.

66.    Captain Kennedy's discrimination toward Mr. Christensen was so blatant that Defendant's Deputy Chief of Operations, Marc Schershel, had to step in and overturn disciplinary action toward Mr. Christensen.

67.    Mr. Schershel explained that Defendant uses the term 'occurrences' to refer to any use of time off for sickness or tardiness.

68.    Defendant had a policy that, when an employee receives more than six (6) occurrences in a rolling twelve (12)-month period, that employee will face disciplinary action.

69.    In March of 2019, Mr. Schershel learned that Mr. Christensen had hit the maximum of "six occurrences" for tardiness.

70.    He also learned that the disciplinary action process against Mr. Christensen had been set in motion.

71.    After investigating the "six occurrences," Mr. Schershel learned that Mr. Christensen did not, in fact, have "six occurrences," and Defendant's management had written Mr. Christensen up for "occurrences," when he had approved time off.

72.     Mr. Schershel observed that Mr. Christensen was treated differently to other Denver Health employees, and "for this reason, [he] intervened and stopped the disciplinary process from moving forward."

73.     As of March 2019, Defendant was aware that Captain Kennedy, Lieutenant Baker, and Lieutenant Pattinson were among Defendant's senior staff who were discriminating toward Mr. Christensen.

CAPTAIN HULAC'S DISCRIMINATION

74.     Captain Hulac was also two (2) ranks above Mr. Christensen and was one of Lieutenant Baker's and Lieutenant Pattinson's supervisors.

75.     Captain Hulac oversaw the Quality Assessment and Assurance Department.

76.     Captain Hulac audited trip sheets to ensure protocols were followed and was in charge of pulling and analyzing trip data.

77.     Captain Hulac repeatedly targeted Mr. Christensen and would regularly call Mr. Christensen into unwarranted meetings to discuss alleged infractions.

78.     For example, at times, Ms. Stephens, Mr. Christensen's paramedic partner, recommended the medication that was used on a particular patient.

79.     Even when Ms. Stephens was the paramedic who recommended the medication be used, Captain Hulac would call Mr. Christensen into his office to question him regarding the treatment.

80.     Ms. Stephens repeatedly attempted to attend the meetings with Captain Hulac and management when the command staff was questioning Mr. Christensen regarding medication that was administered under her direction.

81.     Every time Ms. Stephens attempted to attend the meetings, the command staff rebuked her and indicated that they only wanted to speak with Mr. Christensen.

82.     The conduct was so pervasive and unusual that Ms. Stephens recommended to Mr. Christensen that he start recording his conversations with management.

<u>DEFENDANT'S CULTURE OF RETALIATION AND DISCRIMINATION</u>

83.     In 2017 former gay Denver Health employee, Brent Houchin, filed a lawsuit against Denver Health alleging that he was terminated on the basis of his sexual orientation.

84.     Upon information and belief, Denver Health did not discipline any of its employees for the termination of Mr. Houchin.

85.     In 2018, during an awards ceremony for a black paramedic, a Denver Health paramedic displayed a "Proud Boys" white power sign during the awards ceremony in the awards photo.



86.     The Federal Bureau of Investigations has classified the Proud Boys as a far-right extremist group.

87.     As an example of the culture Denver Health permitted in its paramedic department, Denver Health did not discipline its employee for displaying a Proud Boys sign during a photograph for one of its black paramedics.

88.     In 2019 Carol Nichols, a black human resources representative, sued Denver Health alleging that she had been denied accommodation and disciplined excessively based on her race.

89.     Upon information and belief, Denver Health did not discipline any of its employees for the termination of Ms. Nichols.

90.     In 2020, multiple employees filed a whistleblower complaint alleging that Defendant retaliated against employees who spoke about discrimination or working conditions.

91.     Upon information and belief, Denver Health did not discipline any of its employees based on the whistleblower complaint related to Defendant's pattern of intimidation and harassment of its employees who complained.

92.     During Mr. Christensen's employment with Defendant, there was also a culture of intimidation and harassment within the paramedic division.

93.     During Mr. Christensen's employment, Defendant was aware that there was a culture of intimidation and retaliation within the paramedic division.

94.     On March 6, 2019, Denver Health sent out an email to the entire paramedic division acknowledging that the department had received, "anonymous letters of complaints [from employees] that were received by members of Denver Health Senior Leadership."

95.     The March 6, 2019 email also acknowledged that the letters complained of a "lack of appropriate response from leadership to employee complaints … [and] noted a fear of retaliation for complaining."

96.     The March 6, 2019 email stated that, "Denver Health leadership has determined to have an outside, independent investigation of the department regarding the[] allegations… The outside investigator is Melinda Sanders."

97.     The March 6, 2019 email warned employees that the results of the investigation were protected by attorney-client privilege and advised employees to keep the contents of their interviews confidential.

98.     The March 6, 2019 email provided a confidential basis for employees to complain stating:

> If you want to speak with the investigator but you are not selected for an interview, please contact the Legal Department and ask to speak to Karen McTavish, Senior Assistant General Counsel, or Scott Hoye, General counsel. Your call to Legal will be confidential.

99.     On March 28, 2019, in response to Defendant's promise to investigate employees claims confidentially, Mr. Christensen wrote a detailed letter to Denver Health's legal department complaining of discrimination:

> To Whom It May Concern,
>
> My name is Jordan Christensen. I have been a Paramedic with the Denver Health Paramedic Division since October, 2012. During that time, I have been recognized multiple times as an exemplary employee. In 2014, I was given the Medical Director's Award by our Medical Director, Dr. Kevin McVaney for outstanding patient care. In 2018, I was awarded the Paramedic Preceptor of the Year award as voted for by my peers recognizing me in my abilities to teach and pass along my knowledge and skills as a paramedic to those just learning. I have received multiple Commendations from the Paramedic Division, as well as DH Star Awards from peers, and letters from patients directly to my superiors recognizing me for exemplary patient care during perhaps what was during the worst and most traumatic times of their lives. I have strived to provide excellent patient care throughout my career at Denver Health, however, the treatment that I have received from my superiors, those whom I am supposed to look up to for encouragement and motivation has been anything but superior.

Unfortunately, due to the large amount of intimidation and fear that I have developed from speaking to a superior in person, I have chosen to put this in writing, as a way to express my feelings without fearing the truth of what needs to be said. When I was hired at Denver Heath, this job was my passion. It was my dream since I was a child, when my grandma passed along "The Knife and Gun Club" book to me, to be a Denver Health Paramedic. This hospital and this paramedic division were the best of the best. It was, at that time, a true honor to put on the uniform that I wear every day and care for the hundred and some odd thousand patients that we see every year. I was proud of my fellow employees, and I trusted those who ranked higher than I did.

Several years into my career, it started to become apparent to me that this was not the place of employment that I was brought up into, and so proud of, Since that time, I have been discriminated against for my sexual orientation, intimidated and threatened by my supervisors, embarrassed in front of my coworkers, made fun of by my superiors for my sexual orientation, and retaliated against when I have taken the opportunity to report this in the past. I dread every single day going to work. I am miserable in my work place and I am constantly fearful of my job. Denver Health strives to, most importantly, provide the highest quality of patient care to our patients. I have been recognized multiple times for this, however I am threatened and intimidated nearly weekly going to my job. I avoid and dread seeing any of our senior command staff and I have been singled out dozens of times for things that seem to go overlooked with other employees. It is the same several individuals that have done this to me during that time. I have received no support when I have brought this up to higher ranking command staff (Chief level) employee's and I feel strongly that I will be retaliated against if I tried to bring this up to the hospital administration. It has been a very difficult decision for me to come to this point of discussing this with you, however no one should have to work in an environment such as this. It has been my decision to seek my own legal counsel following this meeting and these incidents.

I am presenting you with this now because I truly cannot work like this anymore. It is well known that being a Paramedic is a stressful job due to the population that we work with, the extremely busy days, physically and emotionally demanding calls, however this is not what brings me stress. This is my 13th year working in Emergency Medical Services. I LOVE being a Paramedic and I LOVE taking care of the people that we serve, I cannot stand the workplace environment that I am subjected to. The emotional stress that I experience daily from our senior command staff, and that they seem to go out of their way to provide me with, has caused me the lack of desire to ever come to work, excessive sleeping, excessive alcohol consumption, unsafe sexual practices, weight loss, effect on my relationship, and past thoughts of suicide. While some may think 'Why

don't you quit? This is just a job," it is MY job. I have earned my seniority at the Denver Health Paramedic Division and this is where I have chosen to build my career. Sadly, the treatment that I have gotten at work and the lack of response to it makes Denver Health the last place that I would ever recommend that someone apply for a job, or seek their healthcare, because of the way I have been treated. I fear this for anyone else and if I can save anyone else the heartache and stress that I experience daily, I would go out of my way to do so. I don't think that is the way it should be for someone who was so passionate about what Denver Health is, or was. I have been put in a situation during my career where I subconsciously feel as though I deserve how I have been treated at work. I deserve to be comfortable, happy, and accepted in my work place and they have taken that away from me and made me feel unworthy due to things as simple as sexual orientation. I have feelings similar to that of a battered woman who is a victim of domestic violence; I am afraid that if I report anything, my situation will only get worse.

I hope that bringing these cases and examples up to you through this meeting and through the Paramedic Division investigation that is currently underway will shed some light on the work environment that experiencing and I would certainly hope that solutions and resolutions can be constructively made through all of this.

100.    At or around the time of the foregoing complaint, Defendant scheduled a time for Mr. Christensen to meet with attorney Melinda Sanders.

101.    Defendant did not keep the meeting scheduled between Mr. Christensen and Ms. Sanders confidential.

102.    Captain Kennedy, the same individual who had engaged in a pattern of discrimination toward Mr. Christensen, escorted Mr. Christensen to the meeting with Ms. Sanders and sat outside waiting for Mr. Christensen while he was meeting with Ms. Sanders.

103.    While escorting Mr. Christensen to the meeting with Ms. Sanders, Mr. Kennedy mocked Mr. Christensen's decision to wear the dress uniform.

104.     During the meeting with Ms. Sanders, Mr. Christensen described the pattern of harassment that he had been subject to at the hands of Defendant's management team within the paramedic division.

105.     At the conclusion of the meeting, Ms. Sanders encouraged Mr. Christensen to complain to Defendant's HR department and retain counsel due to the ongoing harassment.

106.     After the meeting with Ms. Sanders, and following her advice, Mr. Christensen complained to Defendant's HR team detailing the discrimination described herein.

107.     Upon information and belief, after Mr. Christensen spoke with Ms. Sanders and complained to Defendant's HR team, Defendant did not investigate Mr. Christensen's claims.

108.     Upon information and belief, Defendant did not discipline any of its employees that discriminated toward Mr. Christensen.

109.     Upon information and belief, Captain Kennedy, Captain Hulac, Lieutenant Baker, and Lieutenant Pattinson were made aware of Mr. Christensen's complaint of discrimination to Ms. Sanders.

110.     Captain Kennedy, Captain, Hulac, Lieutenant Baker, and Lieutenant Pattinson continued to discriminate toward Mr. Christensen after he complained of discrimination and were not subject to any discipline.

### DEFENDANT'S WRONGFUL TERMINATION IN VIOLATION OF ITS OWN POLICIES

111.     Denver Health generally does not terminate paramedics for medical mistakes.

112.    Otis McKay, a former Lieutenant for Defendant, who was employed at the same time Mr. Christensen was employed, explained that "Denver Health does not terminate paramedics for bad medicine."

113.    Lieutenant McKay explained, "[t]here have been at least thirty incidents where paramedics have accidentally given a patient the wrong medication… [i]n those cases, the incidents are documented and talked about… [t]he aim is to correct the issue, not to discipline the paramedics for the mistakes."

114.    Ms. Stephens, Mr. Christensen's paramedic partner, further explained Defendant's policy stating, "[w]hen paramedics make mistakes in the field, medical or otherwise, Denver Health's practice is to have a conversation with the paramedic about how they can fix their mistakes going forward, but they are never fired."

115.    Ms. Stephens notes that, "[i]n [her] 25 years with Denver Health, [she] ha[s] never seen anyone get fired for giving bad medicine on a call."

116.    Mr. Stephens provided an example explaining that she "know[s] of numerous examples of bad medicine by other paramedics that did not result in discipline… [f]or example, another paramedic … repeatedly practiced bad medicine… [i]n fact, his partners frequently wrote him up for his poor performance… [h]e was a heterosexual white male and he was not subject to discipline… [i]nstead, a member of the command staff specifically advocated on his behalf and ensured that he kept his job."

117.    Ms. Stephens provided another example noting, "Denver Health has sent other paramedics back into field training because of their medicine to avoid terminating them."

118.     Mr. Schershel explained the policy stating, "Denver Health's Paramedic Division, specifically avoids the use of disciplinary action where medicine is involved."

119.     Mr. Schershel further explained that "[i]nstead of discipline, re-education is used to help paramedics learn from medical mistakes."

120.     On December 8, 2020, Mr. Christensen and his superior, Andrew Bruckner, responded to a call of a woman who had sharp pain in her chest while driving.

121.     This call came from the parking garage across the street from the paramedic division.

122.     This parking garage was part of the building where the Captains and Lieutenants for Denver Health's Paramedic Department worked.

123.     Upon arriving on scene, the woman was inside the car and her daughter was nearby crying.

124.     While Mr. Bruckner talked with the daughter, Mr. Christensen attended to the woman in need.

125.     Mr. Christensen noted that the woman had lost control of her bladder and bowel which was a sign of severe illness, and no blood pressure was obtainable.

126.     The woman was also extremely pale and sweaty which signified a potential cardiac event.

127.     Lieutenant Pattinson, Mr. Christensen's supervisor, was walking out as Mr. Christensen was taking care of the patient and asked if he could assist.

128.     Mr. Christensen asked Lieutenant Pattinson to spike a couple of IV bags, which Mr. Pattinson did.

129.     Mr. Bruckner established the first IV and checked her blood pressure.

130.    Mr. Christensen started the second IV bag and gave her some Aspirin while Mr. Pattinson prepped the EKG pads.

131.    Once they got the patient on the stretcher, she began saying she felt like she was going to die.

132.    Based on his training and experience, Mr. Christensen made the decision to administer the patient epinephrine, which was consistent with Defendant's protocols at the time.

133.    After Mr. Christensen administered the epinephrine, the patient began to feel better and even told Mr. Christensen that she felt better and did not need to go to the hospital, but Mr. Christensen followed protocol and brought her to the hospital.

134.    Lieutenant Pattinson and Mr. Bruckner watched Mr. Christensen the entire time he administered the medications and did not say anything in reference to Mr. Christensen's treatment of the patient or his administration of medication at the time or immediately thereafter.

135.    The patient made it to the emergency room and was discharged within the next day or two.

136.    Upon information and belief, after the call was completed, Lieutenant Pattinson, one of the individuals who had been discriminating toward Mr. Christensen for years, wrote up an incident report.

137.    On January 8, 2021, Defendant terminated Mr. Christensen due the alleged incident on December 8, 2020.

138.    Defendant's decision to terminate only Mr. Christensen based on the December 8, 2020 alleged "incident" was pretextual.

139.    Upon information and belief, neither Lieutenant Pattinson nor Mr. Bruckner were subject to any disciplinary action.

140.    Mr. Christensen was treated differently than his counterparts who do not openly identify as gay who were present on December 8, 2020 based on his sexuality.

141.    Mr. Christensen was treated differently than his counterparts who do not openly identify as gay who have been permitted to return to training or simply subject to discussions regarding their treatment.

142.    Mr. Christensen was terminated by Defendant due to his sexual orientation and in retaliation for his complaints to Defendant's HR department regarding the pattern of discrimination that he was subjected to dating back to June 26, 2015.

143.    As a direct and proximate cause of Defendant's conduct, Mr. Christensen has been damaged in an amount to be proven at trial.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Discrimination Under Title VII, 42 U.S.C. § 2000 e-2(a)(1))

144.    Mr. Christensen hereby incorporates the allegations as if fully set forth herein.

145.    At all relevant times, Mr. Christensen is considered a protected class under Title VII because he is gay. 42 U.S.C. § 2000e-2(a)(1).

146.    At all relevant times, Mr. Christensen was qualified to perform the position of Paramedic.

147.    Defendant discriminated against Mr. Christensen based on his sexual orientation.

148.    Defendant treated Mr. Christensen less favorably than his similarly situated, straight, employees by taking actions including, but not limited to, the following:

      a.    Having his superiors consistently make crude and inappropriate comments about Mr. Christensen's sexual orientation and preferences towards Mr. Christensen;

      b.    Harassing Mr. Christensen on his timeliness when other employees clocked in at the same time or later than him;

      c.    Harassing Mr. Christensen about his attire and uniform when his partner(s) were dressed similarly to Mr. Christensen;

      d.    Consistently evaluating and observing Mr. Christensen on the job at a frequency which surpassed employees who are not gay;

      e.    Scrutinizing Mr. Christensen's treatment methods when there were no complaints against him, nor did he break any protocol; and

      f.    Terminating Mr. Christensen based on his sexual orientation and complaints to HR.

149.    The discrimination Mr. Christensen endured from Defendant based on his sexual orientation permeated the workplace creating a hostile environment.

150.    As a result of Defendant's actions, Mr. Christensen has suffered damages, including but not limited to the loss of past and future wages and benefits, loss of professional opportunities, emotional distress, and mental pain and anguish.

151.    Mr. Christensen is entitled to his attorney's fees and costs incurred in this matter.

152.    Mr. Christensen is further entitled to any such relief as permitted under Title VII.

## SECOND CLAIM FOR RELIEF
(Retaliation under Title VII, 42 U.S.C. § 2000e-3(a))

153.    Mr. Christensen hereby incorporates the allegations as if fully set forth herein.

154.    At all relevant times, Mr. Christensen is considered a protected class under Title VII because he is gay. 42 U.S.C. § 2000e-2(a)(1).

155.    At all relevant times, Mr. Christensen was qualified to perform the position of Paramedic.

156.    Defendant retaliated against Mr. Christensen based on his sexual orientation as described herein.

157.    As a direct result of Mr. Christensen's opposition to the activities prohibited by Title VII, Defendant subjected Mr. Christensen to actions which a reasonable employee would have found materially adverse.

158.    Defendant treated Mr. Christensen more adversely than his similarly situated, straight counterparts.

159.    Defendant's retaliation included, but was not limited to:

a.      Subjecting Mr. Christensen to a higher frequency of evaluations and observations than his similarly situated, straight, counterparts;

b.      Harassing Mr. Christensen for timeliness and dress code when ignoring the same actions of his similarly situated, straight, counterparts; and

c.      Terminating Mr. Christensen after he lodged multiple complaints

to the Defendant about supervisors inappropriate and harassing behavior.

160.    Defendant's retaliatory conduct was the direct and proximate cause of Mr.

Christensen's injures, damages, and losses.

161.    As a result of Defendant's actions, Mr. Christensen has suffered damages,

including but not limited to the loss of past and future wages and benefits, loss of

professional opportunities, emotional distress, and mental pain and anguish.

162.    Mr. Christensen is entitled to his attorney's fees and costs incurred in this

matter.

163.    Mr. Christensen is further entitled to any such relief as permitted under

Title VII.

**THIRD CLAIM FOR RELIEF**
(CADA Discrimination; C.R.S. §§ 24-34-401 *et seq*)

164.    Mr. Christensen hereby incorporates the allegations as if fully set forth

herein.

165.    At all relevant times, Mr. Christensen is considered a protected class under

CADA because he is gay.

166.    At all relevant times, Mr. Christensen was qualified to perform the

position of Paramedic.

167.    Defendant discriminated against Mr. Christensen based on his sexual

orientation.

168.    Defendant treated Mr. Christensen less favorably than his similarly

situated, straight employees by taking the following actions including, but not limited to,

the following:

a.  Having his superiors consistently make crude and inappropriate comments about Mr. Christensen's sexual orientation and preferences towards Mr. Christensen;

b.  Harassing Mr. Christensen on his timeliness when other employees clocked in at the same time or later than him;

c.  Harassing Mr. Christensen about his attire and uniform when his partner(s) were dressed similarly to Mr. Christensen;

d.  Consistently evaluating and observing Mr. Christensen on the job at a frequency which surpassed employees who are not gay;

e.  Scrutinizing Mr. Christensen treatment methods when there were no complaints against him, nor did he break any protocol; and

f.  Terminating Mr. Christensen based on his sexual orientation and complaints to HR.

169.   The discrimination Mr. Christensen endured from Defendant based on his sexual preference permeated the workplace creating a hostile environment.

170.   As a result of Defendant's actions, Mr. Christensen has suffered damages, including but not limited to the loss of past and future wages and benefits, loss of professional opportunities, emotional distress, and mental pain and anguish.

171.   Mr. Christensen is entitled to his attorney's fees and costs incurred in this matter.

172.   Mr. Christensen is further entitled to any such relief as permitted CADA.

## FOURTH CLAIM FOR RELIEF
(CADA Retaliation; C.R.S. §§ 24-34-401 *et seq*)

173.    Mr. Christensen hereby incorporates the allegations as if fully set forth herein.

174.    At all relevant times Mr. Christensen is considered a protected class under CADA because he is gay.

175.    At all relevant times, Mr. Christensen was qualified to perform the position of Paramedic.

176.    Defendant retaliated against Mr. Christensen based on his sexual orientation as described herein.

177.    As a direct result of Mr. Christensen's opposition to the activities prohibited by CADA, Defendant subjected Mr. Christensen to actions which a reasonable employee would have found materially adverse.

178.    Defendant treated Mr. Christensen more adversely than his similarly situated, straight counterparts.

179.    Defendant's retaliation included, but was not limited to:

a.    Subjecting Mr. Christensen to a higher frequency of evaluations and observations than his similarly situated, straight, counterparts;

b.    Harassing Mr. Christensen for timeliness and dress code when ignoring the same actions of his similarly situated, straight, counterparts; and

c.    Terminating Mr. Christensen after he lodged multiple complaints to the Defendant about supervisors inappropriate and harassing behavior.

180.     Defendant's retaliatory conduct was the direct and proximate cause of Mr. Christensen's injuries, damages, and losses.

181.     As a result of Defendant's actions, Mr. Christensen has suffered damages including but not limited to the loss of past and future wages and benefits, loss of professional opportunities, emotional distress, and mental pain and anguish.

182.     Mr. Christensen is entitled to his attorney's fees and costs incurred in this matter.

183.     Mr. Christensen is further entitled to any such relief as permitted under CADA.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Mr. Christensen respectfully requests a trial by jury on all issues so triable, and damages, as follows:

1.     The Court declare that the actions of Defendants described in this Complaint are in violation of Title VII and CADA;

a.     The Court award Plaintiff back pay and benefits;

b.     The Court award Plaintiff front pay and benefits;

c.     The Court award Plaintiff punitive damages;

d.     The Court award compensatory damages;

2.     The Court award Plaintiff his reasonable attorneys' fees and costs in this action as permitted by law;

3.     The Court award pre-judgment and post-judgment interest at the highest lawful rate; and

4.      The Court award any such further relief as this Court deems just and

proper.

**Plaintiff requests a trial to a jury on all issues so triable.**

Dated: August 2, 2022

Respectfully submitted,

KONTNIK | COHEN, LLC

*s/ Spencer J. Kontnik*
Spencer J. Kontnik, #47447
Matthew L. Fenicle, #57055
201 Steele Street, Suite 210
Denver, Colorado 80206
Telephone: (720) 449-8448
E-Mail: skontnik@kontnikcohen.com
E-mail: mfenicle@kontnikcohen.com
Attorneys for Plaintiff JORDAN CHRISTENSEN